## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY a/s/o | : | CIVIL ACTION |
| FLORENTINA AND BASILE BOICU, | : | |
| Plaintiff, | : | |
| v. | : | NO.  5:12-CV-01113-LS |
| LG ELECTRONICS, INC. and | : | |
| LOWES COMPANIES | : | |
| Defendants | : | |
| v. | : | |
| A1 ELECTRIC PLUMBING AND HEATING; | : | |
| HEFFLEGER KITCHEN CENTER; and | : | |
| KITCHEN ADVANTAGE | : | |
| Third Party Defendants. | : | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ANSWER TO DEFENDANT'S MOTION TO PRECLUDE PLAINTIFF'S EXPERT TESTIMONY AND MOTION FOR SUMMARY JUDGMENT

Defendant, LG Electronics, Inc. ("LG") the manufacturer of the LG microwave oven Model LMV2053 which the Plaintiff contends caused the fire which is the subject of this action filed a Motion for Summary Judgment and Motion to Exclude the testimony of Plaintiff's expert, Gregory L. Booth, PE ("Booth") on the grounds that Mr. Booth's conclusions are not based on accepted scientific principals and methods and therefore do not meet the standard reliability required by the Federal Rules of Evidence as set forth at Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993).  The deposition of Plaintiff's expert, Gregory L. Booth, PE, and the deposition of LG's expert, Richard W. Kovarsky, PE have been taken following production of their expert reports.

Booth's report and deposition testimony makes clear that his analysis and conclusions followed NFPA 921 which provides the methodology for determining the cause of a fire through the process of elimination.  The NFPA guidelines are generally recognized by the Court providing reliable methodology for purposes of Federal Rules of Evidence 702 and the Daubert standard.

## I. COUNTER STATEMENT OF THE FACTS

On the morning of January 24, 2011 Mrs. Boicu, a nurse, prepared to leave her home

and realized that she had forgotten her work bag. (Exhibit "D", p.13) Mrs. Boicu then went back into her home to get her bag out of her office and at that time she smelled smoke. (Exhibit "D", p.13) Mrs. Boicu then went to wake her husband and advised him that she smelled smoke in the home. (Exhibit "D", p.13) Mr. Boicu went to the basement to check the furnace while Mrs. Boicu proceeded to the kitchen. (Exhibit "D", p.13) At that time Mrs. Boicu noticed smoke and observed a flame or sparks inside the microwave and yelled for her husband to come to the kitchen area. (Exhibit "D", p.13). When describing what she saw inside the microwave she testified at her deposition that she just saw that it was something burning in there. She doesn't know if it was sparks. She saw light inside and flickering. When asked the difference between an active fire and electrical spark she indicated, "It was more of an active fire. That's what I can remember." (Exhibit "O", p.16) She indicates at her deposition what she was referring to through the back of the microwave it looked like it was a flame in there. (Exhibit "O", p.17) She indicates the fire was coming from that compartment where you put your food since "That's all you can see through the window, so I would think that." (Exhibit "O", p.18) She did not know if there was fire above the microwave at that point before she ran out or not. (Exhibit "O", p.18)  When Mr. Boicu got to the kitchen he noticed a lot of smoke coming out from around the microwave as well. (Exhibit "E", p.33) Both Mr. and Mrs. Boicu indicated at their deposition they saw a flame or light inside the microwave cooking compartment when they went into the kitchen. When Mr. and Mrs. Boicu saw flames come out of the cabinet they left the home. (Exhibit "D", p.14; Exhibit "E", p.33) Mrs. Boicu then called 9-1-1 to report the fire and the fire department arrived at 6:35 a.m. (Exhibit "O", p.16) Mrs. Boicu's brother in-law takes pictures for fire companies and took a picture of the fire before the state trooper and the fire company arrived.  The photograph of the fire is attached as Exhibit "U" and referred to as photograph No. 2 in Plaintiff's expert, Booth's, report. (Exhibit "B", p.4) The Boicu residence was insured under the policy of insurance with Allstate Insurance Company ("Allstate") who subsequently paid the Boicus claim for the damage to the home and the replacement of their personal property.  In this subrogation action Allstate is seeking to recover from LG the monies paid under the Boicu claims on the grounds that the microwave manufactured by LG was the cause of the fire. (Plaintiff's Amended Complaint, Document 37 on the dockets)

The Boicu residence is a ranch style dwelling located at 64 Lobachsville Road, Fleetwood, PA. (Exhibit "Q", p.1) The fire was confined to the northeast outside wall of the

kitchen of the dwelling specifically in the area above and surrounding the range/microwave. (Exhibit "G", p.4; Exhibit "P", p.2; Exhibit "Q", p.1) The ceiling of the kitchen above the fire center was charred and damaged. (Exhibit "Q", p.1 Fig. 1) Firefighters had to remove the range, microwave, several counter top appliances, cabinetry and ceiling in order to thoroughly extinguish the fire. (Exhibit "Q", p.1) A single receptacle for the microwave had been installed in the cabinet above the microwave by A1 Electric Plumbing & Heating Company in 2008 at the time renovations to the kitchen were contracted by Mr. and Mrs. Boicu. (Exhibit "Q", p.1) The original range hood and light fixture were replaced by low voltage under cabinet lighting and a new microwave oven and vents were installed. (Exhibit "Q", p.1) The microwave oven was installed around September 2008 and functioned normally and appropriately for a little over two years while the Boicus owned it. (Exhibit "P", p.3) The Boicus were not using the microwave oven when the fire started or the previous day before the fire. (Exhibit "D", p. 12) Mrs. Boicu indicated they had not used the microwave the night previous. (Exhibit "D", p. 12)

The Defendant points out in its Brief there was conflicting testimony between Heffleger, A1 Electrical and the Boicus regarding who actually installed the microwave. In support of this conflict LG pointed out that Robert Oplinger, the owner of A1 Electrical, testified during his third visit to the residence, Mr. Boicu informed him that he himself installed the microwave referring to Oplinger's deposition transcript p. 54, 1.19- p.55, 1.7, attached as Exhibit F to Defendant's Brief. Mr. Oplinger at his deposition also testified that Mrs. Boicu, Mr. Boicu and their daughter were there when he was at the Boicu home on the third visit. (Exhibit "R", p.13). When questioned specifically he elaborated and indicated their daughter was roughly his son's age, she was in her late 20's and was well aware of his son being there and his son was a teenager and that he does not remember the date and year he was out there. (Exhibit "R", p.15). As LG's counsel is aware from the deposition of the Boicus they have no children and it appears that the recollection that Mr. Boicu informed him that he installed the microwave is unreliable on its face.

Mr. Oplinger also pointed out that whoever installed the microwave had to drill the hole through the cabinet and fish the cord up through the upper cabinet. (Exhibit "R" p. 18). He indicated when you install a microwave you put a plate on the wall. The microwave hangs on that plate, in the process of putting the microwave in the hole and hanging it you got to feed the cord up through that hole in the cabinet, in the bottom of the cabinet. Next you have to cut a

hole in the box so that it matches up with where the rough wiring on the box located. (Exhibit "R", p.19). Mr. Oplinger also indicated he has installed thousands of microwaves in the last 35 years. (Exhibit "R", p.55). He doesn't specifically recall plugging in the microwave, but general courtesy to a customer he usually plugs in the microwave. (Exhibit "R", p.55) He confirmed he and his son did the electrical work. (Exhibit "R", p.56)

The deposition of the owner of Defendant, Heffleger Kitchen Center, was also taken. Mr. Hallowell indicated he subcontracted out the work. (Exhibit "S", p.8) He subcontracted the work to Carl Binner. (Exhibit "S", p.21) He indicated that Mr. Boicu is inaccurate when he said Heffleger installed the microwave. (Exhibit "S", p.27) He also indicated that other people from Heffleger that would have performed work at the Boicu residence would have been Mr. Binner and his wife. (Exhibit "S", p.36) He also indicated that Mr. Binner had hung microwaves for Heffleger. (Exhibit "S", p.37) He assumed whoever installed the microwave is the person who would have drilled the holes because they have to match to the template to install the microwave you would stick the template on the wall, mark it, screw it into the studs and then hang the microwave on top, then cut a hole underneath the upper cabinet and plug it into the wall. (Exhibit "S", p.46)

LG's expert, Richard Kovarsky, indicates at his deposition when discussing the installation process that "Well you have fine balancing act going on. You have a microwave oven that is reasonably heavy. You have a bracket on the wall. You need to get the back part of the microwave onto that bracket, swing it up into place, route the power cord through the hole that is in the bottom of the cabinet, get two fasteners to the top of that cabinet down into the microwave and secure it all into place. He stated that is why it's recommended to be a two person job. (Exhibit "T" pp. 75-76). The testimony of the representatives of Defendants, A1 Electric and Heffleger, both confirm that at least two persons were present when they performed work at the Boicu residence.

The issue raised by LG in its Brief as to who installed the microwave is inserted to support its expert's testimony as a speculative explanation of how the microwave cord could have been damaged. There has been no documentation, testimony, or any other evidence to support the assertion by LG's expert that the power cord was damaged after manufacture by LG or during installation. A scene investigation was conducted on March 2, 2011 approximately five weeks after the fire which included representatives from LG. (Exhibit "G", p.1) The parties

confirmed that the fire originated in the kitchen and as indicated in the report of LG's expert, Kovarsky, smoke more specifically originated in the general vicinity of the microwave oven. (Exhibit "G", p.2) LG's expert further confirms no evidence was found at the scene to indicate that the fire originated at the range, nor was there evidence that the fire originated within the walls of the structure. (Exhibit "H") As confirmed by LG's expert it was noted that the component parts believed to be associated with the microwave oven were located and were the subject of an examination on May 4, 2011 at which time the LG representatives were present as well. (Exhibit "G", p.3). LG's expert acknowledges at that examination no evidence that any appliances other than the microwave oven were a factor in the causation of this loss. (Exhibit "H", p.1)

Plaintiff retained a fire investigator Steven C. Rowe who prepared a report dated November 17, 2013. (Exhibit "P"). Mr. Rowe concluded that the fire originated along the northeastern wall of the kitchen above the range in the location of the LG microwave oven. (Exhibit "P"). He further concluded "Upon the elimination of all other known potential ignition sources, it is my professional opinion to a reasonable degree of scientific certainty by the above standard that the cause of the cause of this fire was due to a failure, malfunction and/or defect within the confines of the LG microwave oven that caused the appliance to overheat and/or produce arcs and/or sparks igniting combustible materials within the appliance. (Exhibit "P"). His investigation and opinion were developed using systematic methodology as per NFPA 921. (Exhibit "P"). LG's expert confirms that he has no issue with the factual observations noted in Mr. Rowe's report and only takes exception with the conclusion that the fire originated in the LG microwave oven. LG's expert admits in his report, "While I do agree that the fire starts in the area of the microwave oven, I do not agree that the fire specifically originates within the microwave oven." (Exhibit "H", p.2)

At the deposition of Defendant's expert, Mr. Kovarsky indicated LG became a client of his around 2008. (Exhibit "T", p.19). He was questioned regarding other microwave fires. He testified a direct recollection of a microwave fire case in Kansas City where it was alleged to be a fire in the microwave. His opinion was that it actually started on the cook top or on the range below the microwave. He testified the case went to trial and the other side prevailed. He indicated he has handled more than 100 cases in the past six years and he averages 50 cases a year for LG. (Exhibit "T", pp. 23-24) When asked if in any of those cases involving LG

microwaves he had ever determined the LG microwave itself malfunctioned he answered, "Yes"(Exhibit "T", p.29). In those instances the nature of the malfunction was magnetron failures, failures associated with the vent fan and the vent fan circuit, wiring or something in the area of the printed circuit board for the control panel, and then there's the ones where it's been something else, meaning it's not the microwave. (Exhibit "T", p.29). When asked if any of the microwave malfunctions that he testified to involved a fire he answered, "Yeah. Typically most of the time I get called on one of those there's been a fire."(Exhibit "T", p.30).

When asked to explain the microwave malfunction cases he has investigated that resulted in fires he described magnetron failures involve a microwave beam hitting the wave guide, the wave guide overheats, and at least in one design there was plastic over the top of the wave guide, the plastic would eventually ignite. (Exhibit "T", p.31). In vent fan failure cases he indicated, "They have winding failures on the motor and other wiring failures and you can get sparking or some other type of overheating, and then there's plastics in the area typically, especially with an over-the-range microwave. You can get greasy residues accumulating in the unit, so there's no lack of combustible materials." (Exhibit "T", pp.31-2). With regard to explanation of circuit board failures and how a fire starts he stated, "Most of those cases we have not been able to identify a specific failure, again because of the damage that is done. But you're going to get some type of an overheating event and from there start igniting combustibles." (Exhibit "T", p.32). When asked why a circuit board would fail he indicated, "Most of those cases the damage was extensive enough that while we could get back to the circuit board as our origin, we didn't have enough to work with in terms of determining a specific failure mode." (Exhibit "T", pp.32-3)

When Mr. Kovarsky was asked about his training regarding cause and origin of microwave fires he indicated, "I've had plenty of courses and seminars on general fire investigation. I'm obviously, with my electrical engineering background, familiar with circuits and electronics and electrical systems. But no course would have been Microwave Fires 101." (Exhibit "T", p.48). At the initial investigation of the Boicu fire he made a determination as to the general origin of the fire as, "in and around the location of the microwave oven." (Exhibit "T", p.51). When specifically asked if he is aware of any homeowner activities of the Boicus after installation that would have caused damage to that cord he answered, "Again, did I see them do something? No. But this cord is sitting in the cabinet. It's an accessible cabinet. I don't

know over the course of the two and a half, three years, whatever it was between the time it was installed and the time of the fire, what things were taken out, put back in. I wasn't there to monitor those activities." (Exhibit "T", pp.76-77). When asked if the electrical event that he described on the power cord was the basis for his opinion that there might have been damage to the cord either when it was installed or afterwards he answered, "in a nutshell yes." (Exhibit "T", p.106). When questioned as to his experience in appliance design and manufacturing he indicated, " I have never been employed by a manufacturer of those appliances except as in cases here.    And I have never designed major household appliances for any product." (Exhibit "T", pp.129-130)

When LG's expert was questioned with regard to his methodology in investigating fires he answered, "I would have used basically scientific methods as outlined in NFPA921. I would have documented the fire scene.    I would have collected data evidence of what this fire damage, fire patterns were like. Got the benefit of witness statements through Mr. Rowe since this was his scene and his witnesses, so to speak, at least as far as the homeowners. Participated in joint evidence exam, collected some more information there and analyzed all that information, come up with a conclusion or hypothesis if you will based upon analysis of that data, try to see if there was anything in the data that would be considered inconsistent or unexplainable by the data relative to the hypothesis. I felt it was all consistent, so in my opinion I had a conclusion." (Exhibit "T", p.130).  Mr. Kovarsky confirmed he did no testing "on a microwave cord as part of my investigation other than the examination of the artifacts from this scene." (Exhibit "T", pp.132-3). When asked regarding his criticisms of Plaintiff's expert, Mr. Booth, he indicated, "...my criticisms on Mr. Booth are strictly based on our difference as it relates to interpretations of evidence, as relates to evidence of applicability of standards. From what I've read I would say he's probably a well-qualified engineer in the arena of power systems and some of these other areas. We are having some professional differences of opinion on this matter.  That's all it is." (Exhibit "T", p.148)

Plaintiff's expert, Gregory L. Booth, PE, is an electrical engineer with vast experience in the electrical industry and electrical utility industry spanning over 45 years.  (Exhibit "A", p.1) He has expertise which covers all aspects of the electrical industry including construction and design, planning, operation, product design and manufacturing, construction observation,

teaching and authoring of seminars, manuals and books. (Exhibit "A", p.1) He has been accepted as an expert in the electrical industry, electrical utility industry, construction industry, electrical product and components industry, and safety including customary practices in electrical utility fields, and electrical product design and manufacturing field, National Fire Protection Association standards and forensic accident reconstruction including but not limited to fires involving electrical equipment in facilities. (Exhibit "A", pp.1-2) As the CV of Mr. Booth confirms he is a Registered Professional Engineer in 22 states including Pennsylvania. (Exhibit "A", p.2) He has been accepted as an expert in 17 states and federal jurisdictions including Pennsylvania courts and before its Public Utilities Commission. (Exhibit "A", p.2) His CV contains a list of cases from 1981 to the present date. (Exhibit "A")

Mr. Booth's deposition was taken on February 19, 2014 wherein he confirmed that after systematically going through all the evidence from the case, acknowledging the agreement as to the origin of the fire not being in dispute; reviewing the eyewitnesses testifying to the fire and looking at all the evidence under the standard procedures, his training and analysis of evidence, the use of National Fire Protection Association 921, and his 50 years of training in forensic analysis as a procedural guide and relying on the testimony and the photographs of the evidence of all the parties, and after an iterative process excluding all components, determining every component that could have created the fire and then obtaining exemplars to determine what, if any, defects exist in the design and the manufacturing of a component that could have allowed for that component to have failed, arrived at a conclusion within a reasonable degree of engineering certainty that the cause of the fire was the LG microwave oven. (Exhibit "B", pp.8-9) Mr. Booth acknowledged that his process was narrowed in that there was an agreement of the parties as to the origin of fire which was not in dispute and in addition he had the benefit of eyewitnesses who watched the fire begin before it spread to damage the Boicu home. (Exhibit "C", p.70) The parties had effectively eliminated all other possible electrical appliances and the investigation was limited to either the power cord attached to the microwave which he considered part of the microwave oven and/or the microwave oven itself and he determined the only probable cause of the failure was a defect and malfunction of the LG microwave oven. (Exhibit "C", p.77) Mr. Booth also indicates that his examination of the microwave oven power cord indicates that the cord sustained a short circuit some time during this event when the heat from the fire melted the insulation for when the cabinets ignited. He indicates that photograph

No. 2 of the fire in the kitchen depicts the fire traveling up both sides of the microwave oven. (Exhibit "U") This indicates that the microwave oven was the source of heat to start the fire. Since there is no overvoltage and/or surge protection in the microwave, voltage transients can damage the microwave circuit control board which could lead to a fire within the microwave. (Exhibit "B", pp.7-8)

Despite Mr. Booth's reliance of generally accepted principals of NFPA 921 the Defendant, LG, contends that Mr. Booth did not use acceptable methodology and his testimony should be excluded. LG filed a Motion to Preclude Plaintiff's expert testimony arguing 1) Booth's opinions are based on unreliable methodology and ipse dixit; and 2) Booth's opinion is misleading, too broad and is not helpful to the jury and therefore Plaintiff's expert's opinion is unreliable and inadmissible testimony entitling LG to summary judgment.

## II.  QUESTION PRESENTED:

1.  Whether the proposed expert testimony of Gregory L. Booth meets the Federal Daubert standard for expert testimony?

Suggested answer: Yes.

2.  Whether the proposed expert testimony of Defendant's expert, Richard Kovarsky, as to the power cord being damaged during installation causing the fire meets the Daubert standard for expert testimony?

Suggested answer: No.

## III.  STANDARD FOR SUMMARY JUDGMENT

LG correctly points out that Summary Judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the movie party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

When deciding a motion for summary judgment, a court must draw all reasonable inferences and view all facts in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202(1986); Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir.2005) (citations omitted); see also United

States v. Diebold, Inc., 369 U.S. 654, 82 S. Ct. 993, 8 L.Ed.2d 1976 (1962). A Court may grant summary judgment if it determines that, after reviewing the evidence and making all inferences in favor of the non-moving party, there is no genuine issue of material fact to warrant a trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

## IV.   LEGAL ARGUMENT

### (1) THE EXPERT TESTIMONY OF GREGORY L. BOOTH MEETS THE STANDARD FOR RELIABILITY REQUIRED UNDER DAUBERT.

LG has asked the Court to exclude the expert testimony of Gregory L. Booth, PE, on the grounds that his conclusions are not based on reliable principals. At the deposition of Mr. Booth he was questioned as to his process of evaluating the origin and cause of the fire and whether or not he followed any particular standards. (Exhibit "C", p. 76) Mr. Booth answered, "Well, I customarily start out with NFPA 921." (Exhibit "C", p 77). In addition, Mr. Booth indicated he systematically goes through all of the evidence in the case. (Exhibit "C", p 77) He testified in a case like this where the origin of the fire is not a disputed point, he then accepts the array of experts on both sides when they have all agreed on the origin. (Exhibit "C", p 77) He further pointed out that he relied upon two eyewitnesses and one very specific witness of what was going on in the origin. (Exhibit "C", p 77) He concluded that the origin of the fire no longer required going through any of the steps and any forensic evaluation as it was not a disputed item. He points out the issue is then if the origin of the fire caused the fire precipitated it; what to a reasonable degree of engineering certainty was the reason for the fire, the reason that whatever any individual determines caused it was the reason that was caused. (Exhibit "C", pp. 77-8). He confirmed he used the National Fire Protection Association 921 as a guide. (Exhibit "C", p. 78). When asked if anything in particular in NFPA 921 he indicated the entire document. He did not exclude any of it. (Exhibit "C", p. 79)  In fact NFPA 921 was one of the documents that were brought with Mr. Booth to his deposition.   Included in NFPA 921 is Section 18.2.1 "Process of Elimination". Section 18.2.1 states in pertinent part as follows: Any determination of fire cause should be based on evidence rather than on the absence of evidence; however when the origin of the fire is clearly defined, it is occasionally possible to make a credible determination regarding the cause the fire even when there is no physical evidence of the ignition source available.  This finding may be accomplished through the credible

elimination of all other potential ignition sources, provided that the remaining ignition source is consistent with all known facts. The standards for fire investigation set forth in NFPA 921 has been held by numerous courts as a methodology that is reliable for the purposes of Daubert analysis.

The Supreme Court has held that a trial court has a special obligation to ensure that any and all expert testimony is not only relevant but reliable. Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137, 147 (1999) quoting Daubert v. Merrell Dow Pharmaceuticals, 501 U.S. 579, 589 (1993). This inquiry is controlled by Rule 702 of the Federal Rules of Civil Procedure which provides: "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise, if 1) the testimony is based upon sufficient facts or data, 2) the testimony is the product of reliable principals and methods, and 3) the witness has reliably applied the principals and methods to the facts of the case.

The Third Circuit has described three requirements as the "trilogy of restrictions on expert testimony: qualification, reliability and fit". Calhoun v. Yamaha Motor Corp. U.S.A., 350 F.3d 316, 321 (3d Cir. 2003). When evaluating the reliability of a witness' methodology the Third Circuit has stated that a Court is guided by several factors taken from Daubert:

> (1) Whether a method consists of testable hypothesis; (2) whether the method has been subject to peer review; (3) The known or potential rate of error; (4) The existence and maintenance of standards controlling the techniques operation; (5) whether the method is generally accepted; (6) The relationship of the technique to methods that have been established to be reliable; (7) The qualifications of the expert witness testify based on the methodology; and (8) The non-judicial uses to which the method has been put.

Calhoun, 350 F.3d at 21.

The Supreme Court has stated that these factors need not be rigidly applied and that not all are pertinent in every case, stating that the factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise and the subject of his testimony." Kumho Tire, 526 U.S. at 150. A Rule 702 inquiry is a flexible one and the

Court should also take into account any other relevant factors.  Calhoun, 350 F.3d at 321.

The standards for fire investigation set forth in NFPA 921 had been used to provide a reliable methodology for purposes of Daubert analysis.  In the case of Hoang v. Funai Corp., 652 F. Supp. 2d 564 (M.D. Pa. 2009), Chief Judge Kane noted that, "Several courts, including this one, has recognized that NFPA 921 offers a comprehensive and detailed treatment for fire investigation and held its methodology is reliable for purposes of Rule 702 Id. at 567, citing Booth v. Black & Decker, Inc., 166 F.Supp. 2d 215, 220 (E.D. Pa. 2001).  Rule 702 embraces a "liberal policy of admissibility" pursuant to which it is preferable to admit any evidence that may assist the trier of fact.  Pineda v. Ford Motor Company, 520 F.3d at 237, 243 (3d Cir. 2008) quoting Kannankeril v. Terminex International, Inc., 128 F.3d 802, 806 (3d Cir. 1997).

LG is contesting the reliability of Mr. Booth's proposed testimony.  Expert testimony is "reliable" when it is based upon sound methodology and technique.  In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744-46 (3d Cir. 1994).  The touchstone is whether the expert's methodology is "sufficiently reliable so that it will aid the jury in reaching accurate results."  Id. at 744.  The standard for reliability is not high.  Id. at 744.  The grounds for the expert's opinion merely have to be good, they don't have to be perfect.

The report of Plaintiff's expert proceeds with a summary of fire events.  The summary includes the eyewitness testimony of Mr. and Mrs. Boicu who were at the microwave oven when smoke and flames started.  Mr. Booth confirms that the fire department arrived at the fire scene at 6:35 a.m. (Exhibit "B", p. 5) and the fire department had the fire "knocked down" at 6:57 a.m. and "under control" at 7:12 a.m. (Exhibit "B", p. 5).  Mr. Booth then proceeds with a review of evidence, including photographs depicting the housing of the microwave oven that remained after the fire.  (Exhibit "B", p. 5-6).  He confirms that the plastic parts and circuit boards were completely destroyed by the fire and the heat.  (Exhibit "B", p. 5-6).  The magnetron, capacitor and transformer were all that remained in place within the microwave housing.  (Exhibit "B", p. 5-6).  He received the photographs of the remains of the power cord for the microwave with all three conductors showing signs of arcing together.  He confirms an examination and testing with a voltage/ohm meter indicated the separated romex wire was the black wire or hot wire.  (Exhibit "B", p. 5-6).

Attached to his report was a list of documents reviewed which included all of the

pleadings and discovery, the initial report of LG's expert, Richard Kovarsky; the report of John C. Gabriel, PE along with the multiple photographs; the depositions of the witnesses including the plaintiffs and two defendants; answers to discovery; Rule 26 Disclosures exchanged by the parties; report from Lyons Fire Company. (Exhibit "X"). At Mr. Booth's deposition he further confirmed a list of materials that were transferred to him, marked as Booth Exhibit 2 which included one cord coil; wire segments and terminal found near microwave oven; segment of wire from microwave receptacle; CKT and terminal; under cabinet lighting modules; portion of old hood branch CKT; portion of microwave branch CKT and receptacle; microwave branch circuit breaker; microwave power cord; microwave and microwave door frame; portion of wall cabinet and lighting; microwave mounting bracket; microwave door frame and fryer and unknown appliance. (Exhibit "Y").

Mr. Booth was questioned specifically on his investigation and methodology and confirmed that he customarily starts out with NFPA 921 and systematically goes through all the evidence in the case. He states in this case the origin of the fire was not a disputed point. The array of experts on both sides all agreed on the origin of the fire. He considered the two eyewitnesses and one very specific eyewitness of what was going on in the origin. He concluded the origin of the fire to him longer required going through any of the steps or any forensic evaluation because it was not a disputed item. He worked through systematically looking at all the evidence under the standard procedures of his training in forensic analysis of evidence, use of the National Fire Protection Association 921 as part of the guide, 50 years of training in forensic analysis as a procedural guide and relied on the testimony and the photographs and the evidence of all the parties and after an iterative process of including and excluding all components, determining every component that could have created the fire and then obtaining exemplars to determine what, if any, defect exists in the design and manufacturing of a component that could have allowed for that component to have failed, arrived at a conclusion to a reasonable degree of engineering certainty as to the cause of the fire. The methodology of Plaintiff's expert mirrors that of Defendant's expert, Richard Kovarsky, as testified at his deposition (Exhibit "T", p. 130) wherein he describes using basically the scientific method as outlined in NFPA 921. Mr. Kovarsky collected data evidence of what the fire damaged, fire patterns were like. Got the benefit of witness statements through Mr. Rowe since he was at the scene and analyzed the information from the joint evidence exam and came

up with the conclusion or hypothesis based upon analysis of that data, to try to see if there was anything in the data that would be considered inconsistent or unexplainable by the data relative to the hypothesis. He then presented his opinion and conclusion.

Mr. Booth confirmed at his deposition that the cord could not have been the origin of the fire through arcing of the power cord unless the power cord was so poorly designed and manufactured that it was the equivalency of something like paper mache that allowed a massive amount of insulation to be torn away from the conductors to start arcing and it wasn't. He concluded that there was no evidence and testimony that existed to support Defendant's expert's assertion of damage to the cord, there is nothing present to damage the cord to a significant enough degree that the power cord on a microwave could initiate an arc flash event absent somebody purposely removing two layers, one layer overall and a layer on each of two conductors purposely to allow the conductors to come together. As a result of all of the foregoing he reached the conclusion that to a reasonable degree of engineering certainty the fire was initiated by and originated in the microwave oven. He supported his conclusion with photographs showing the fire burning upward on both sides of the microwave oven and into the cabinetry above and surrounding the microwave oven. The photograph was taken before the fire department arrived at the scene by a family member of the Boicus. He confirmed the testimony and the depositions of Mr. and Mrs. Boicu where they testified they saw a flame or light within the microwave oven cooking compartment and a lot of smoke emanating from around the microwave. He confirmed that eyewitness accounts presented by Mr. and Mrs. Boicu demonstrated the microwave malfunctioning.

After review of all the evidence and documentation in his possession Mr. Booth's opinion was within a reasonable degree of scientific certainty that the LG microwave oven was defective and the fire at the residence of Mr. and Mrs. Boicu was a result of a malfunction of the microwave oven which initiated heat and flames which spread to the surrounding cabinetry and caused the damages to the Boicu home. Through the process as provided by NFPA 921, Plaintiff's expert, Booth, was able to determine the only possible cause of the fire was the failure of the microwave oven. He then took it a step further and determined what about the microwave oven was defective and concluded that it lacked over voltage protection to prevent a fire event occurring if voltage transients were present.

As previously indicated the reliance by experts on NFPA 921 is recognized as a generally accepted methodology in <u>Hoang v. Funai Corporation</u>, <u>supra</u> a case involving a fire allegedly caused by a combination TV/VCR unit, the Court considered <u>Daubert</u> challenges to plaintiff's expert witnesses based upon challenges to their methodology. <u>The defendants contended that the general cause and origin expert provided no indication that he used a methodology that met the Daubert standards.</u> (Emphasis added) The Court noted that the expert testified that he was guided by the NFPA 921 guidelines in his description of the steps he took during the investigation indicated that he followed the standards. The Court stated that the NFPA 921 methodology is widely considered to be reliable for purposes of Rule 702 and thus held that the expert "employed a methodology that was subject to peer review, had a known or potential rate of error, could be measured against existing standards and is generally accepted" (<u>Id.</u> at 570)

The Court in <u>Hoang</u> discussed plaintiff's expert who had examined the remains of the damaged TV/VCR unit, fire scene and photographs and other evidence. That second expert concluded the TV/VCR unit was defective and had caused the fire. Although the expert could not determine which particular component of the device had failed, he was able to conclude that the unit caused the fire using the process of elimination of NFPA 921 18.2.1. Having determined that the point of origin was clear and that all other potential sources of the fire in the area were eliminated that expert concluded based on NFPA methodology that defect in the TV/VCR unit caused the fire. The Court rejected the challenge to the expert stating as follows: "It is clear that NFPA 921 guideline, which has been determined to provide a reliable method of fire investigation, endorses the process of elimination of certain circumstances. Of course, in following the NFPA 921 methodology the expert Panunto was required to make certain conclusions about the circumstances of the fire to determine whether process of elimination was appropriate. Here, Panunto concluded that the origin was clearly defined and that all other potential sources of the fire in the area of the origin could be credibly eliminated...." The Court found that Panunto had at least good grounds for his conclusion and there was not such a great gap between the data and the conclusion reached to render his opinion unreliable. <u>Id.</u> at 574.

In this case, all parties agree as to the origin of the fire and agree that it is centered at or about the location of the microwave. In addition, in this case, the parties agree that the fire was either caused by the microwave itself or by its power cord. The only dispute that remained between the experts is whether or not the fire was caused by the malfunction or by damage to

the power cord during the installation of the microwave or by the Boicus after installation. There has been no testimony, documentation or any other evidence that sets forth any damage occurring to the power cord at any time prior to the fire to support the position of LG's expert.

This is not a case where the experts were required to differ on the elimination of the electrical devices in the area of origin. In this case both experts and all parties that investigated the fire agree the area of origin was the microwave oven and its power cord.

After review of all the evidence and documentation in Plaintiff's expert's possession he reached the conclusion in his professional opinion, to a reasonable degree of engineering and scientific certainty, that the LG microwave oven Model 2053 was defective and the fire at the residence of Mr. and Mrs. Boicu is the result of a malfunction of the microwave oven which initiated heat and flames which spread to the surrounding cabinetry and caused the damages to the Boicu home. The standards for the fire investigation of Mr. Booth pursuant to NFPA 921 were and had been held to provide a reliable methodology for purposes of <u>Daubert</u> analysis and therefore the Defendant's Motion should be denied.

(2)     <u>DAUBERT</u> DOES NOT REQUIRE IDENTIFYING A SPECIFIC
        MANUFACTURING DEFECT

Nothing in <u>Daubert</u> requires an expert in this type of an investigation to identify the specific defects which resulted in the fire as argued by LG. It is sufficient that Plaintiff's expert show through accepted scientific methodology that the cause of the fire was a manufacturing defect, although the precise nature of the defect may remain unidentified. <u>Erie Insurance Exchange v. Applica Consumer Products, Inc.</u>, 2005 WL 1165562, *7 (M.D. Pa. May 17, 2005). In the present case the evidence has been almost entirely destroyed by the fire. In this case, Mr. Booth after concluding that the microwave was defective and that the fire was the result of a malfunction of the microwave oven further concludes the microwave lacked over voltage protection to prevent a fire event occurring if voltage transients were present. Due to the microwave oven being consumed by the fire he was unable to identify the specific component part of the microwave oven affected by the lack of over voltage protection causing the fire. As testified by Defendant's expert, Richard Kovarsky, the inability to identify a specific failure because of fire damage is common. Mr. Kovarsky details in his deposition multiple malfunctions of microwaves that he had investigated where he was unable to identify a specific

failure because of the damage that was done by the fire event. He testified as to fires preventing the identification of specific failures to circuit boards; fan failures and other similar fire investigations.

In the Hoang case the Court similarly allowed testimony of the electrical engineer expert that the fire was caused by a malfunctioning defect in the TV/VCR unit despite the fact that the expert's analysis could not reveal the exact component in the unit that had failed. In the matter of Nationwide Insurance v. Sears Roebuck Company, 2013 WL 1389766 (E.D. PA April 3, 2013) the manufacturer of a stove which allegedly started the fire moved for summary judgment on the grounds that the plaintiff's expert did not identify a specific defect in the product. In that case the expert, Mr. Marshall concluded the malfunction had occurred in the control panel of the stove and could have been caused by arcing the wires, overheating of the circuit board or some other heat source that was hidden by significant damage to the stove. The Court held the fact that Mr. Marshall did not identify what part specifically within the control panel caused the damage was of no import. Id. at *3.

The admission of expert testimony despite the inability to identify the exact part which malfunctioned is entirely consistent with the malfunction theory of products liability which permits a plaintiff to prove a manufacturing defect through circumstantial evidence. Barnish v. KWI Building Company, 602 Pa. 402, 980 A.2d 535, (Pa. 2009). The malfunction theory does not require a plaintiff to establish one specific defect but only to eliminate all other possible causes to present evidence of possible defects in the subject product. The Pennsylvania Supreme Court made this clear in Barnish in which it listed the types of circumstantial evidence that can be used as proof of a defect and included "expert testimony as to a variety of possible causes". Id. at 542. Thus the criticism of Mr. Booth not identifying a specific defect is without merit and inconsistent with the testimony of its own expert. The Defendant's expert has confirmed that consistent with the Court's opinions noted above that in cases where evidence has been almost entirely destroyed by fire it would not be unusual that a proof of defect shown by circumstantial evidence and specific defect remain unknown.

In the recent opinion of the United States District Court of the Middle District of Pennsylvania Mutual Benefit Insurance Company v. Kaz, Inc. Civil Action No. 1:12-CV-2108 (Exhibit "W"), the Court held under Daubert there is no reason why the expert must specifically

identify the exact manufacturing defect at issue in order for his opinion to be admissible. The Court cited <u>Nationwide Insurance v. Sears Roebuck & Company</u>, <u>supra</u>, which held, "The fact that the plaintiff has not identified what specifically within the control panel caused the damage is of no import;" and <u>Erie Insurance Exchange v. Applica Consumer Products, Inc.</u>, Civil Action No. 02-1040, 2005 WL 1165562, at *7 (M. D. PA, May 17, 2005) "Marshall's opinion is not rendered unreliable and inadmissible simply because he failed to determine the exact component of the coffee maker that caused the ignition of the internal fire."

The case of <u>Mutual Benefit Insurance Company v. Kaz, Inc.</u> involved a subrogation claim involving a vaporizer that caused a fire. The cause and origin expert concluded the fire's point of origin was the living room specifically at the power cord of the vaporizer manufactured by the defendant, Kaz. Plaintiff's expert in <u>Kaz</u> determined that the power cord failed and ignited the carpeting and other nearby combustibles. Plaintiff's expert using NFPA 921 considered and eliminated all of the possible causes of the failure of the cord and determined that the only possible cause was a manufacturing defect. The defendants in <u>Kaz</u> filed a motion pursuant to Rule of Evidence 702 indicating that plaintiff's expert should not be admitted because his conclusions were not based upon sound methodology and technique. The Court deemed that the plaintiff's expert in <u>Kaz</u> through the process of elimination provided by NFPA 921 concluded that the only possible cause was the manufacturing defect. However the expert could not identify the specific defect because of the damaged caused to the cord by the fire. The Court cited numerous court opinions recognizing NFPA 921 as a reliable source for purposes of Rule 702 and held under <u>Daubert</u> there is no reason why the plaintiff's expert must specifically identify the exact manufacturing defect at issue for his opinion to be admissible. The Court found that the plaintiff had established the admissibility of its expert's testimony, reports and opinion by a perponderance of the evidence and the proposed testimony was based upon sound methodology and technique and will aid the jury in reaching an accurate result and therefore denied a <u>Daubert</u> challenge to the electrical expert. As noted above testimony by an expert that a fire is caused by a malfunctioning defect despite the fact that the expert's analysis could not reveal the exact component in the unit that has failed does not bar the testimony of the electrical engineering expert. Defendant's Motion should therefore be denied.

**(3)     THE FACTS OF THIS CASE ARE NOT ANALOGOUS TO <u>SHAFER V.
       LG ELECTRONICS U.S.A.</u> AND <u>BOOTH V. BLACK AND DECKER</u> AS
       ARGUED BY LG.**

In support of LG's Motion to Preclude Plaintiff's Expert's Testimony LG relies on two opinions and attempts to shape the facts of this case to fit the holdings in <u>Booth v. Black and Decker, Inc.</u>, 166 F.Supp. 2d 215, 220 (E.D. Pa. 2001) and <u>Shafer v. LG Electronics U.S.A., Inc.</u>, 2010 WL 8757823 (N.D.Tex. Sept. 30, 2010).  LG in an attempt to analogize the <u>Shafer</u> and <u>Booth</u> case to this matter argues (1) Plaintiff's expert, Booth has no reliable source of transient voltage that allegedly damaged the internal components of the subject microwave; (2) Booth has referenced irrelevant and inapplicable industry standards in support of his proffered opinion; (3) Booth's methodology is unreliable and he fails to complete any testing whatsoever; and (4) Booth uses unreliable information to support his hypothesis that the microwave self started focusing on U.S. Consumer Products Safety Commission reports.

The <u>Booth v. Black and Decker Inc.</u> case involved a plaintiff bringing suit against a toaster manufacturer for an alleged internal defect causing a fire.  In that case the plaintiff's expert gave an opinion based on his general knowledge of cut off devices and the fact that he knew some other toasters did incorporate such a device.  The Court granted summary judgment on the basis that the expert "produced no persuasive objective evidence that this method was superior, had a known or potential rate of error, could be measured against existing standards or is generally accepted as required under Rule 702".  <u>Shafer v. LG Electronics U.S.A., Inc.</u> was a Texas case relied upon by LG where the Court found the plaintiff's expert's opinion was fatally flawed because he never tested an exemplar to determine if self starting was even possible.

The Defendant has attempted to shape the facts of this case and the testimony of Plaintiff's expert to fit the facts relied upon in <u>Booth</u> and <u>Shafer</u>.  LG argues that Plaintiff's expert had no reliable source for the transient voltage that allegedly damaged the internal components of the Boicu microwave.  To support this argument LG's counsel distorts the importance of the photograph contained in the first draft of Plaintiff's expert report.  Counsel argues, "Booth <u>relied on</u> the photograph as evidence that a power surge was the origin of the Boicu's fire." (LG Brief p.8) (emphasis added)  The original language of Booth's report is cited

at page nine of LG's Brief wherein Booth indicates that the photograph, "appears to have been taken during the time of the fire department was at the location... If this transformer was near the house where the fire was located, it could have caused transient voltage to be introduced onto the power line serving the Boicu residence. Electronic equipment, like the circuit board controls within the microwave oven, does not tolerate such transient conditions and the internal components can sustain damage due to voltage transients. Counsel further exaggerates the importance of the reference to a photograph when arguing, "Booth's concession that the photograph was erroneous and that any related reference and inferences must be removed is significant, as the likely source of transient voltage -- the arcing transformer -- no longer exists." (Emphasis added) Counsel further goes on to state, "Incredibly, the elimination of the transformer as a possible source of transient voltage did not affect his opinion, as Booth's "opinion and findings are completely independent of the precise source of overvoltage condition." (Exhibit "C", p. 154.). The language contained in Booth's report in no way suggests that the photograph was "relied upon" or that the removal of the photograph "incredibly ... did not affect his opinion". The words of Mr. Booth in his report when making reference to the photograph could not have been more clear that the photograph is an example of over voltage events. The reference in no way suggests as argued by LG that he relied upon that photo or that its removal was significant.

LG then cites Booth's deposition testimony in response to a question as to direct evidence of a transient surge at the time of the fire wherein Mr. Booth indicated, "we have no evidence that one transient voltage existed or didn't exist at the time of the fire" but counsel leaves out the further explanation when Booth answers, "I don't have documentation of it, but I would say to a reasonable degree of engineering certainty that there was transient over voltage on the electric distribution system that served this residence." (Exhibit "C" p. 155) When asked what that opinion was based upon Mr. Booth indicates, "It was based on all of my analysis of FirstEnergy System including testifying on reliability issues in Pennsylvania, the analysis in Pennsylvania including lightening strikes and everything else that is a common occurrence across all parts of the system and that there isn't any single year that you are not going to have all components of the primary electric distribution system that doesn't experience some form of a transient over voltage." (Exhibit "C" p.155, 156). Mr. Booth further explains, "At least once a year you are going to have transient overvoltage on the electric system that will be seen

by the Boicu's home and others.  You would have overvoltage precipitated by the electric utility's operation and its equipment.  You would have transient overvoltages directly driven by lightning strikes on the electric utility system. (Exhibit "C", p.157)

LG's counsel also argues that Booth admitted that, "Despite readily available data from the local electric utility supplier, FirstEnergy System, potentially confirming the frequency of transient voltage at the substation servicing the Boicu's residence, Booth did not obtain this information or complete the overvoltage analysis." (Exhibit "C", p. 125, lines. 16-18).  When answering counsel's questions Booth points to his prior analysis, studies and testimony completed on behalf of FirstEnergy electrical distribution systems throughout Virginia, Pennsylvania, Ohio and New Jersey, and characterizes that prior analysis, study and testimony as support for his assertion that at least once per year the Boicu's residence will experience transient overvoltage whether through lightning strikes or the general operation of the electric utilities' distribution system. (Exhibit "C", pp. 155-160.)  When LG's counsel asked if FirstEnergy would have data that would document surges Mr. Booth indicated that they would have that information.  Mr. Booth stated his knowledge is based upon other work that he has done and testimony and the reliability associated with the FirstEnergy System that he has never found any component in their system that didn't have lightning strikes.  LG's counsel then asked Mr. Booth whether or not FirstEngery would have that data and questioned how counsel could obtain that data.  Counsel for LG chose to characterize Booth's testimony as evidence of a failure to obtain information to complete the overvoltage analysis, despite the clear testimony from Mr. Booth's as to his knowledge of overvoltage transient conditions on the FirstEnergy system that serviced the Boicu home.  In order to create an analogy with the Shafer case, LG's counsel argues Booth's opinions were based on nothing more than his prior training and experience and that he failed to complete overvoltage analysis and relies, "apparently solely by memory as opposed to even looking at them" on unrelated analyses, studies and testimony. Mr. Booth clearly indicated his opinion was based on all of his analyses of FirstEnergy's system including testifying on reliability issues in Pennsylvania, the analysis in Pennsylvania including lightning strikes and everything else that is a common occurrence across all parts of the system and that there isn't any single year that you're not going to have all components of the primary electric distribution system that doesn't experience some form of a transient overvoltage" in response to LG counsel's questioning.  There is no admission that Mr. Booth failed to obtain

"readily available data from local electric utility suppliers". There is no admission that their documentation or anything further was required to support Mr. Booth's testimony or as LG's counsel argues is needed to "complete the overvoltage analysis."

Booth v. Black and Decker was also cited by LG to argue Plaintiff's expert is obligated to present some type of objective evidence or testing to establish the validity and reliability of his hypothesis that the power cord did not cause the fire and has failed to do so. LG argues Plaintiff's expert admits he did not test the exemplar power cords. Presumably, LG is suggesting this testimony is required to disprove the unsupported theory of damage to the power cord along with the failure to test the exemplar microwaves in any manner whatsoever. As argued previously Daubert does not require identifying a specific manufacturing defect. Further, the malfunction theory does not require Plaintiff to establish one specific defect but only to eliminate all other possible causes to present evidence of possible defects in the subject product. In this case as pointed out and ignored by LG there were eyewitnesses to the fire starting in the Boicus' home. Mr. and Mrs. Boicu were present when the microwave malfunctioned and started the fire in their home. They both testified they saw light inside the microwave and then smoke and flames surrounding the microwave when they were not operating the microwave. The microwave was not turned on by the Boicus and was not put in operation by either of the Boicus when it started to burn. As set forth in Booth's opinion we have eyewitness accounts of Mr. and Mrs. Boicu that the microwave malfunctioned. They both witnessed the microwave started to burn when neither of them were operating the microwave.

The expert's review of all possible sources of the fire in the vicinity of the microwave were eliminated along with other possible sources as the precipitating heat source as indicated in Mr. Booth's deposition at page 70, Exhibit "B". Booth indicates, "We also have a case where there is not a dispute relative to the origin of the fire. The dispute is what precipitated the fire but not the location of it, so we don't have one party saying the fire started on the north wall and somebody else saying it started on the south wall." He indicates in his deposition this was unusual but a clear, undisputed electrical-initiated fire. (Exhibit "C", p. 81) He indicates, "the visual evidence points us to the microwave itself and not any of the wiring, either the cord from the microwave or the receptacle electrical wiring, so that is something that eliminates a lot of analysis that has to be done because we have eyewitnesses." (Exhibit "C", p. 81) He points

out, "we've got an eyewitness that has events going on inside the microwave, not at some other point but at the time of the fire." (Exhibit "C", p. 83).

In addition, even though there was no direct evidence of any damage to the power cord Mr. Booth correctly points out and is questioned extensively on his opinion regarding LG's speculation that the power cord was damaged at some point causing the fire. Mr. Booth testified through engineering and scientific analysis, to a reasonable degree of engineering certainty, nearly a hundred percent certainty, the cord could not have been the origin of the fire through arcing of the power cord unless the power cord was so poorly designed and manufactured that it was the equivalency of something like paper mache that allowed a massive amount of insulation to be torn away from the conductors to start arcing and it wasn't. (Exhibit "C", p. 90). He further explains, "in order to have an arc to start a fire, damage during installation on a power cord to the microwave -- assuming that this microwave had a power cord comparable to the two exemplars I have; there's no reason to believe it wouldn't -- you would have to remove several inches of insulation from the outer polyethylene jacket and at least two of the internal conductor insulations in order for those conductors to come in physical contact to start an arc event." He goes on to explain, "There is absolutely nothing here unless somebody purposely did that with a knife, there's no materials here that would allow that much insulation to be that compromised". (Exhibit "C", p. 90-91). He continues to explain, "insulation, even if it's cut, if I have insulation intact that does not allow the conductors to come in physical contact with one another, I'm not going to initiate an arc. So it's just -- its just inconceivable that that power cord, unless it was an extremely poorly manufactured cord, could have been damaged to the extent that it would result in an arc flash fire event." (Exhibit "C", p. 92). He goes on in further questioning to indicate, "I don't see any evidence of anything, other than somebody purposely shaving off insulation with a knife or some other sharp object on purpose, how enough insulation could be removed from two conductors." (Exhibit "C", pp. 92-93).

The Defendant unjustifiably relies on the <u>Shafer</u> and <u>Booth</u> opinions to support facts which were derived from the questioning at Booth's deposition but ignore eyewitness accounts of how this fire started. We do not have a scenario where there is a dispute that the microwave is the cause of the fire. Further as set forth in Booth's deposition he explained after eliminating

the cord it only left him with the internal components of the microwave. Rather than just stopping at that he went through the detailed analysis to see how and why the internal components of the microwave could cause the fire. He obtained exemplars and looked at the exemplars and identified the lack of surge suppression for overvoltage conditions as an explanation of the malfunction witnessed by the Boicus and causing the fire and damages to the Boicu home. The eyewitnesses accounts of the malfunction of the microwave have not been controverted nor has it been controverted by any discovery to date or from the many depositions taken to date.

Without any evidence of damage to the power cord during installation to support LG's expert's opinion LG has chosen to attempt to challenge deposition testimony of Plaintiff's expert when questioned regarding the overvoltage condition and the specific component(s) of the microwave that were totally consumed in the fire as to the component that failed causing the malfunction of the microwave. LG and its expert have completely ignored the eyewitnesses to the malfunctioning of the microwave. This is a case where we have two eyewitnesses to the malfunctioning microwave and witnesses to the fire beginning in the microwave itself and then continuing up through the cabinet and ultimately damaging the Boicu residence. The testimony of Plaintiff's expert explains how and why the malfunction occurred and explained the science behind what the Boicus witnessed. The eyewitness accounts of the malfunction of the microwave remain uncontroverted.

Plaintiff's expert not providing backup documentation as to lightening strikes and overvoltage conditions on the FirstEnergy System which Mr. Booth testified was within his knowledge and experience has no bearing on the testimony and his opinion as to the malfunction of the LG microwave. Similarly, the failure to test the microwave to recreate the malfunction as witnessed by the Boicus has no bearing on the malfunction or the reliability or admissibility of Plaintiff's expert but only serves as an attempt by LG to shape facts to enable it to argue this case is somehow in line with the <u>Shafer</u> decision and the <u>Booth</u> decision. As previously argued Plaintiff's expert's opinion includes eyewitness testimony as to the commencement of the fire and all of the other components in the area of the fire having been ruled out thereby limiting the possible causes to either the power cord and/or the microwave itself. In addition Mr. Booth explained the damage to the cord necessary to support LG's

theory could not have occurred in installation three years prior to such an event to generate an arc event causing the fire. The opinion of Mr. Booth as to a surge protection device preventing damage to the internal component parts of the microwave again is unrelated to his opinion of the fire being caused by a malfunction of the microwave as witnessed by the Boicus. In addition, no tests are required in order to recreate the eyewitness accounts of the malfunctioning microwave causing this fire. It is not necessary to recreate what was witnessed and documented.

LG's arguments were made in an attempt to analogize this case to attempt to take advantage of favorable holdings in the <u>Shafer</u> and <u>Booth</u> cases cited in LG's memorandum. The suggestion that plaintiffs expert, Gregory Booth, PE, was required to prove or failed to prove a reliable source of transient voltage that damaged the component parts of the subject microwave fails for the reasons set forth above. The issue was created through a twisting of the testimony in response to questioning of LG's counsel not as the result of any legal requirement to support Mr. Booth's opinion that the microwave malfunctioned causing the damages in this case.

The memorandum of LG also discusses industry standards referred to by Mr. Booth at his deposition. This issue again relates to differences of opinion between the parties experts and has no bearing on the admission or reliability of the opinion of Plaintiffs expert. Reference to incidents of self starting microwaves that could not be turned off until the power cord was unplugged were obtained from the website, http://saferproducts.gov and was contained in Mr. Booth's report as well as the report of John C. Gabriel, PE. LG argues this is unreliable information used to support the hypothesis that the microwave self started. This argument ignores the reports and deposition testimony of Mr. Booth where he provides the basis for his opinion and confirmation that Mr. and Mr. Boicu witnessed the microwave malfunctioning. As explained by Mr. Booth in his deposition he was not using the reports as scientific evidence, he used them as a clear indication that there were reports of problems with the LG microwave and the microwave starting inadvertently without purposeful action by the owner. (Exhibit "C" p.140.) He further explained "one defense most product folks argue is nobody's ever made a complaint about this in the entire life of our product and yet here we have a whole series of complaints that mirror the problem here." (Exhibit "C" p.140.) Mr. Booth's report has provided a reliable methodology and basis for his opinion that the LG microwave malfunctioned causing the Boicu fire along with the uncontroverted testimony that the Boicu's

witnessed the microwave malfunction causing the fire to their home.  For all of the foregoing reasons LG's motion should be denied.

**(4)   LG'S EXPERT RICHARD KOVARSKY SHOULD BE PRECLUDED FROM PROVIDING EXPERT TESTIMONY AS TO DAMAGE TO THE POWER CORD DURING INSTALLATION CAUSING THE BOICU FIRE.**

The parties have agreed that the fire witnessed by the Boicus began at the microwave oven and differ only as to whether or not the fire originated at the power cord and/or in the microwave unit itself.  LG's expert, Kovarsky, is the only party who concluded based upon the evidence of an electrical faulting in the power cord that the fire did not originate within the microwave oven and that the faulting "is most probably the result of damage inflicted upon the power cord either during the installation of the microwave oven or by the homeowner activities after installation."  There has been no deposition testimony nor documentation produced by any party that indicates the cord was damaged during the installation three years prior to the fire nor that the cord was damaged by the Boicus post-installation.  (Exhibit "H", p.4)

LG's expert, Kovarsky's opinion as to possible damage to the power cord is based on nothing more than his assertion.  To use the Defendant's words, "This is classic inadmissible ipse dixit" something "asserted but not proved" or commonly referred to as "because I said so".  Using the Defendant's own analysis it's an expert opinion based upon unsupported speculation.  Therefore, LG's expert Richard Kovarsky should be precluded from providing expert testimony as to damage to the power cord during installation causing the Boicu fire.

**IV.   CONCLUSION:**

For the foregoing reasons, Plaintiff hereby requests that Defendant's Motion for Summary Judgment and Motion to Preclude Testimony of Plaintiff's expert, Gregory L. Booth, PE, be denied.

SANDLER & MARCHESINI, P.C.

BY: _____

GREGORY MARCHESINI, ESQUIRE
Attorney for Plaintiff